JOSEPH SPINGARN, complainant,

*v.*

ELLA SPINGARN, defendant.

[Decided June 3d, 1930.]

*Messrs. Lichtenstein, Schwartz & Friedenberg,* for the complainant.

*Messrs. McCarter & English,* for the defendant.

BACKES, V. C.

This suit is by a husband against his wife to recover $38,850 of Liberty bonds and treasury notes, or their value. He claims she took them from his safe deposit box in the Guaranty Trust Company, New York, shortly before she left him in October, 1924. To her suit in the Supreme Court of New York for a separation, he counter-claimed for a separation and to recover $38,850 of Liberty bonds or their value. The present suit is for the identical property, though differently described. The court denied the wife relief and dismissed the husband's counter-claim on the merits; so the judgment roll read. The husband seeks to avoid its force by the plea that the issue concerning the bonds was not in fact tried nor

decided. According to the common law rule in this state the judgment is a bar. "In a second suit between the same parties for the same cause of action, all triable matters within the issues [of the first suit] are *res judicata.*" *Nagel* v. *Conrad, 96 N. J. Eq. 61.* In a second suit between the same parties for a different cause for action it is permissible to look into the record to ascertain whether an issue presented in the second suit was actually tried and decided in the first. "In a second suit between the same parties for a different cause of action only those matters within the issues actually litigated and determined [in the first suit] are *res judicata.*" *Nagel* v. *Conrad, supra; Paterson* v. *Baker, 51 N. J. Eq. 49,* and *Walsh Estate, 80 N. J. Eq. 565,* are illustrations of the application.

The rule in New York is even more stringent than at common law. Under section 482 of the Civil Practice act:

"A final judgment dismissing the complaint before the close of the plaintiff's evidence does not prevent a new action for the same cause of action, unless it expressly declares that it is rendered upon the merits.

"A dismissal of a complaint or a counter-claim at the close of the plaintiff's or defendant's evidence, as the case may be, or a dismissal of a complaint or counter-claim at the close of the whole evidence is a final determination of the merits of the cause of action and bars a new action between the same parties or their privies for the same cause of action unless the court shall dismiss without prejudice."

This case comes squarely within the provision of the second subdivision of the section. In *Hollenbeck* v. *Aetna Casualty and Surety Co., 214 N. Y. Supp. 402,* it is held that a judgment of dismissal on a nonsuit is a bar to a second suit unless it recites to be without prejudice, and that if the judgment be mistakenly entered, in failing to state that it is without prejudice, the remedy is to have it corrected. That that is the appropriate course is also indicated in *Jones* v. *Gould, 129 N. Y. Supp. 1038,* and *Caruso* v. *Metropolitan Stores, 212 N. Y. Supp. 199.* Both were on motions to correct the judgments in the earlier suits to avoid pleas of *res judicata.* *Clark* v. *Scovill, 198 N. Y. 279,* is authority that

the attack must be direct. There, there were three defenses pleaded, two on the merits, one to the jurisdiction. A verdict was directed for the defendant followed by judgment of dismissal on the merits. On motion the trial court struck out the words "on the merits" as unwarranted. The order was appealed and reversed by the appellate division because the judgment *might* have rested on the meritorious defenses. The court of appeals reversed the appellate division, holding the true rule to be, that the judgment *must* have rested on them to have conclusive force. In other words if it might have rested on the non-meritorious plea the judgment was not a bar. *Lodewick* v. *Cutting, 201 N. Y. Supp. 276,* is not authority for a collateral attack. There the first suit had been dismissed on a demurrer to the complaint. The judgment role read that it was dismissed on the merits. At that time the code of civil procedure was in effect, section 1209 of which provided that

"A final judgment, dismissing the complaint, either before or after a trial, rendered in an action hereafter commenced, does not prevent a new action for the same cause of action, unless it expressly declares, or it appears by the judgment role, that it is rendered upon the merits."

In the second suit for the same cause for action the prior judgment was pleaded in bar. In denying the plea the court treated the words "upon the merits" as a patent inadvertence, and ignored them because the judgment roll bore plenary proof that the judgment was not and could not have been on the merits. The judgment roll in the instant case does not admit of such liberties. The taking of the bonds was a triable issue and it is not apparent from the record that the issue was not tried and determined. All the then known and available facts of the alleged theft of the bonds by the wife were laid before the court by the husband, circumstantially and in detail, and were denied by her. True, he was called as a witness by her and the facts were developed on direct and cross-examination in an effort to show the husband's capacity to pay alimony in the event of a decree and the findings of fact and law were upon the wife's cause for action, and none

upon the issue of the bonds; but the manner of producing the evidence was immaterial, and the absence from the record of findings of fact and of law on that issue—an essential procedure for an appeal—is not evidential that the issue was not, in fact, tried and determined and the determination embodied in the judgment of dismissal on the merits.

The cause will stand over for thirty days to enable the husband to move for a correction of the judgment; otherwise, the prayer of the bill will be denied.

The wife counter-claims for $1,500 money lent; the return of wedding gifts, marked with her initials, and personal apparel, or their money value, and $5,000 of Liberty bonds.

1. The wife had a deposit account with Macy & Company, made up of checks to her order, given by the husband's father, for board money, which the husband consented she should have. He borrowed $1,500 of it for the expenses of a pleasure trip for the two, promising to repay her. The money was hers by gift. He must make good his promise.

2. The wedding gifts—mostly from him, some from her friends, are her property. He gave her an automobile on their wedding day, bearing her initials, as a wedding gift; also, as wedding presents, silver and glassware, silver and glass ornaments and linens, all marked with her initials. Her trousseau is among the articles claimed. He does not deny the gifts, but asserts that the things were for community enjoyment and the gifts limited to that—a string to them. He gave them; he had them marked with her initials to identify them as hers, and he cannot retake them. *Farrow* v. *Farrow, 72 N. J. Eq. 421*. The fact that he took out in his name the license and the insurance on the automobile is not inconsistent with the gift. He claims the gifts from friends to be of the same type. The friends indicated the donee by the initials. The husband must respond in kind or for the value of the articles, and for that purpose there will be a reference to a master.

The $5,000 Liberty bonds. The wife claims that her husband gave her $25,000 in Liberty bonds in May, 1924; that shortly before she left he took them from her safe deposit

box at the Corn Exchange Bank and returned but $20,000. She sues for the difference. He claims she never had Liberty bonds, but that he gave her $30,000 in securities, consisting of $5,000 United States treasury notes; $5,000 Anaconda Copper Mining Company; $5,000 American Woolen Mills; $5,000 American Chain Stores Company, and $10,000 Japanese bonds, and that when she threatened to leave him, and fearing she would and hoping to restrain her, he took out of her box at the Corn Exchange Bank all the securities except the American Woolen Mills, and placed them in his box at the Guaranty Trust Company, to which both had access but to which at the time, he carried the keys  That he did not take the $5,000 American Woolen Mills, because they were registered in her name. That on the same or the next day, and evidently after she discovered that he had taken her securities, she went to his box at the Guaranty Trust Company, borrowed a key from an attendant and took his $28,850 in Liberty bonds and $10,000 in treasury notes, and her own $5,000 in treasury notes. Checked, they agreed upon mutual restitution, and he gave back the $20,000 of securities (she already had her $5,000 of treasury notes, which she had retaken, and to that fact he called attention) and she promised to return his bonds and notes, which later she refused to do, claiming she had not taken them. The question is did he take $25,000 in the securities or in Liberty bonds? The burden of proof is on her.

At the trial in New York she denied taking his bonds and notes and protested that up to that time she had not even heard that they were missing from his box. She also testified that he had given her $30,000 in bonds; that he took from her $25,000 and returned $20,000 of them. This tallies with his version except that she called the securities bonds, and she failed to state that, that she herself had retaken the $5,000 in treasury notes. Further, she was positive that when she left she had only $25,000 in securities. At the hearing in the present suit she confesses that at the time of the trial in New York she knew that her husband complained that his $38,850 in Liberty bonds and treasury notes were missing from his box and had demanded them of her before she left.

And she now says that he gave her $50,000 in securities, that $25,000 were in Liberty bonds, and that when she testified in New York that he had given her $30,000 in bonds and that she had $25,000 when she left, she meant that she had $25,000 in Liberty bonds. Now, if that is what she then meant—that he gave her $25,000 in Liberty bonds and she had $25,000 when she left—her cause fails. That is, however, not what she meant. What she then had in mind was, that her husband had given her $30,000 in the securities above itemized, that he had taken $25,000 of them and failed to return $5,000—the treasury notes she herself had retrieved. To have admitted that she had these notes would have verified his charge that she had been to his box and taken them and his $38,850 of bonds and notes.

The reason for the change of front, that her husband had given her $25,000 in Liberty bonds is transparent. Since the New York trial $28,000 of his bonds, and her $5,000 in treasury notes, were traced to her possession. She sold $5,000 of the bonds; $8,000 were found in her mother's home and she has $15,000. The $5,000 treasury notes were also found at her mother's home. The bonds and the treasury notes were traced and identified by their serial numbers, of which the husband had kept a record.

Her explanation of how her husband came to give her $25,000 in Liberty bonds is romantic. She says that in April, 1924, he feloniously abstracted from her box in the Corn Exchange Bank $25,000 of Liberty bonds belonging to her mother, which she had there for safe keeping; that upon discovery she demanded their return and threatened to tell her mother and brothers; that he solicited a promise not to tell, and in a short time thereafter returned them and at the same time made her a present of $25,000 of Liberty bonds —hush money. That she put them and the $25,000 worth he gave her back in the same box where she also had her remaining securities, and that she took her mother's out and took them to her mother's home when, in October, she found that he had taken hers. She admits that at the time he is supposed to have taken her mother's bonds she knew he had $105,000 in securities in his vault, and she is unable to ad-

vance any theory why he, admittedly wealthy and with good credit, should have taken her mother's bonds upon which to raise money, which she says was the reason he gave. Nor is there any explanation why, in October, he should have taken the wife's bonds and not also her other securities which she admits were together.

Now to account for the $28,000 Liberty bonds and $5,000 treasury notes traced to her and found in her and her mother's possession; she claims that the $5,000 of bonds she sold and the $15,000 she retains are those her husband returned to her—having kept $5,000 for which she is suing, and that the $8,000 of bonds and $5,000 in treasury notes her mother has are part of $25,000 given to her mother by her father just before he died, about the time or shortly before they were put in her Corn Exchange box for safe keeping. But the bonds bear the serial numbers of the $28,000 taken from her husband's box, and the treasury notes, the serial numbers of those he gave her, and that coincidence called for an explanation and disingenuously it is: That when her husband returned her mother's and her securities, her mother's in May and hers in October, 1924, he may not have returned those he had taken but substituted other bonds and treasury notes he then owned. It is ingenious but disproved. Her mother's bonds were taken in April, and returned in May, 1924; that is her statement. Her husband had the $28,850 ear-marked bonds as late as October of that year, for he banked the interest coupons due the 15th of that month—so his deposit slips show.

And this is weird. She professes that neither she nor her mother cashed the semi-annual coupons on the ear-marked bonds that have since accrued, although they were cut off and missing when the bonds were found shortly before and during this trial. Asked to explain, she says her husband had clipped them off before he returned the bonds in 1924. To cut off the coupons that were to accrue right up to the time the bonds were found was uncanny foresight of when they were to be unearthed and it was indeed temarious of the husband to steal the coupons from his mother-in-law's bonds—the bonds he had returned under threat of exposure, and to avoid

scandal he had paid $25,000. Need it be added, that the wife's mother, Mrs. Goldberg, never had $25,000 in government securities, received from her deceased husband? She was able to account for only $13,000—those identified as the complainant's. Where were the other $12,000? She was in modest circumstances and they were surely not consumed in living.

There is also this bit of persuasive evidence that mark the husband's story as true and the wife's unworthy. To support her counter-claim, that he took from her box $25,000 in Liberty bonds and returned but $20,000, and to refute his version that he took $25,000 of securities and returned $20,000 and she herself recaptured $5,000 in treasury notes, she has persisted and reiterated that he never gave her $5,000 in treasury notes and therefore could not have taken and she retaken them. Nevertheless she admits that the $25,000 in securities were $5,000 Anaconda Copper Mining Company, $5,000 American Woolen Company, $5,000 American Chain Stores Company, and $10,000 Japanese bonds; the $5,000 treasury notes would sum up $30,000 in securities she testified in the New York trial that he gave her and which she now says was but $25,000. Now, the untruth of her denial is demonstrated by a memorandum she made of her holdings, made on the back of a Corn Exchange Bank envelope, her bank, and which she accidentally left behind, in which she listed the treasury notes as Series B1927 (NO) 45679, 45675-6-7-8; "Anaconda Copper Mining Company;" "American Woolen Company," and "American Chain Company." The $10,000 Japanese bonds do not appear on the slip because they were given to her shortly before she left.

The serial numbers on the five treasury notes identify them as those given to her by her husband and proves beyond peradventure the fact that her husband had given her $30,000 in securities of which $5,000 were the treasury notes, and further brands her testimony of a $25,000 Liberty bond gift as a fabrication; an expediency to meet and circumvent her husband's charge that she stole his $38,850 bonds and treasury notes.

Her story is not believed and her prayer is denied.